WHIPPLE, C.J.
|2In this appeal, the Municipal Police Employees’ Retirement System (“MPERS”) challenges the trial court’s judgment, which ordered it to pay plaintiff monthly survivor benefits from the date of death of her former husband for the remainder of her life and further awarded plaintiff one-half of the Deferred Retirement Option Plan (“DROP”) benefits received by her deceased former husband. *1079 Plaintiff has answered the appeal, seeking an amendment to the monthly figure in survivor benefits awarded to her, as well as interest from the date of judicial demand and attorney’s fees.
For the following reasons, we reverse in part, amend in part, and affirm in part as amended.
FACTS AND PROCEDURAL HISTORY
Plaintiff, Linda Aranguren Ballex, married Chetley Michael Ballex on August 16, 2001. They had one daughter during their marriage, Verna Ballex, who was born on October 9, 2002.
Chetley was a member of the New Orleans Police Department, and, as such, he was also a member and participant of MPERS, a retirement system established for, among others, police officers employed by municipalities of the state of Louisiana.[1] In May 2005, Chetley completed a Personal History Information Update form, designating Linda, his wife, as his beneficiary with MPERS, and in June 2005, he became eligible for retirement, after twenty-five years of service.
|sOn July 27, 2005, Chetley completed an application for DROP.[2] On that application, Chetley listed Linda and Verna as his beneficiaries and selected the Maximum Plan as his retirement plan option, The Maximum Plan pays the largest monthly benefit to the retiree, but does not provide for a monthly benefit to the named beneficiary upon the retiree’s death. However, by letter dated July 28, 2005,- MPERS informed Chetley that because MPERS is a “qualified plan” under the Internal Revenue Code, see 26 U.S.C. § 401, et seq., a member’s spouse must consent to the selection of a retirement plan that does not provide a monthly benefit to the spouse after the member’s death of at least fifty percent of the-benefit payable to the retiree, pursuant to 26 U.S.C. § 417(a)(2)(A).[3] Enclosed with the letter was a form entitled “Spouse’s Approval of Retirement Option Selected,” and the letter further informed Chetley that failure to return the completed form within ten days of the date of the letter would result in his benefit being computed under the Option 3 plan of retirement, which option provides the surviving spouse with a lifetime retirement benefit of 50% of the retiree’s benefit upon the death of the retiree. Chetley did not return the required “Spouse’s Approval of Retirement Option Selected” form and, instead, withdrew his DROP application. - -
|/Thereafter, on November 8, 2006, Chetley completed another DROP applica *1080 tion, again selecting the Maximum Plan retirement option. He did not include the “Spouse’s Approval of Retirement Option Selected” form with his DROP application, falsely indicating instead on the application that he was divorced. Also on this application, he listed only his daughter Verna as his beneficiary. MPERS did not request a copy of a judgment of divorce or otherwise verify that Chetley was in fact divorced. Rather, relying solely on Chetley’s representation that he was divorced, MPERS processed Chetley’s application with his selection of the Maximum Plan retirement option without requiring or receiving a signed and notarized consent form from Linda, consenting to Chetley’s selection of a retirement plan that would pay no spousal benefit upon his death.
Chetley participated in DROP from December 10, 2006 until April 7, 2009. At the end of his DROP participation, Chetley had a balance of $91,551.37 in his DROP account. Chetley ceased working immediately after the expiration of the period of his DROP participation, and on April 7, 2009, he began receiving monthly retirement benefits under the Maximum Plan retirement option, in the amount of $3,280.27, which he continued to receive until his death in 2011.
The following month, on May 19, 2009, MPERS received a rollover request from Chetley, through which he requested that the entire balance in his DROP account be transferred from the MPERS system to an IRA with the Police and Firemen’s Insurance Association. The requested transfer took place on June 1, 2009, thereby removing all of Chetley’s DROP funds from the MPERS system.
On September 14, 2011, Chetley’s wife Linda called MPERS, at a time when, due to illness, Chetley was nearing death, to inquire about what | Bher benefits would be upon his death. At that time, she learned that, despite her lack of consent, Chetley had retired under the Maximum Plan retirement benefit, such that she would receive no retirement benefit upon his death.[4] Taking the position that once the election of the Maximum Plan retirement option is made, the election is irrevocable, MPERS maintained that no change could be made to Chetley’s retirement plan option. Thus, upon Chetley’s death on October 10, 2011, Chetley’s monthly retirement benefit ceased, and MPERS did not pay Linda any monthly retirement benefit.
Thereafter, Linda instituted this suit, individually and on behalf of her minor child Verna, against MPERS, seeking all benefits to which she and Verna were entitled, as well as one-half of all DROP account funds attributable to Chetley’s employment and retirement contributions during his marriage to Linda. Linda also named as a defendant Kathy Bourque, the director of MPERS, contending that Bo-urque had breached her fiduciary duty to Linda and Verna by, inter alia, allowing Chetley to receive benefits under the Maximum Benefit plan without an affidavit showing Linda’s consent and allowing Chetley to change his beneficiary from her to his daughter, also without an affidavit evidencing her consent. Thus, she also sought judgment against Bourque for all benefits to which she and Verna would have been entitled, together with costs, interest, and attorney’s fees.
Following a trial on the merits, the trial court, in written reasons for judgment, found that Chetley had selected the Maximum Plan retirement option and MPERS had paid him benefits under that option, all without the consent of his wife, Linda, *1081 and that Chetley’s removal of Linda as a beneficiary to his retirement plan was without legal effect. Thus, the court Ificoncluded that Linda was entitled to benefits under the default retirement option, Option 3, as provided in MPERS’s member handbook. Because the court concluded that Chetley’s removal of Linda as a beneficiary was without legal effect, the court further concluded that it was unnecessary to address Linda’s claims of breach of fiduciary duty and MPERS’s statutory immunity defenses. In amended reasons for judgment, the court found that Linda also was entitled to one-half of the DROP benefits that had been paid to Chetley.
In accordance with its reasons, the trial court rendered judgment on February 2, 2016, in favor of Linda and against MPERS, awarding Linda the following amounts: $1,873.69 per month, representing one-half of the amount to which Chet-ley would have been entitled under the Option 3 retirement plan, as provided in the MPERS Member Handbook, retroactive to October 10, 2011, the date of Chet-ley’s death, and continuing for the remainder of Linda’s life; and $45,775.69, representing one-half of the DROP benefits received by Chetley. Regarding Linda’s claims of breach of fiduciary duty, the judgment provided that Linda’s claims against Kathy Bourque were dismissed, “the Court having found that the defendant Kathy Bourque as the Director of [MPERS] did not breach any fiduciary duty to the plaintiff .... ” In the judgment, the court declined to award Linda attorney’s fees and ordered each party to bear their own costs.
From this judgment, MPERS appeals, contending that the trial court erred: (1) in holding that the November 8, 2006 retirement application was without legal effect; (2) in failing to recognize MPERS’s statutory immunity under LSA-R.S. 9:2798.1; (3) in awarding Linda a spousal retirement benefit based upon what Chet-ley should have done on his November 8, 2006 retirement application; (4) in awarding Linda half of Chetley’s DROP 17account, which was legally withdrawn from MPERS in 2009; and, (5) alternatively, if Linda is entitled to judgment in her favor, resulting in the Maximum Plan being revoked and Option 3 implemented, in failing to grant a credit to MPERS for overpayments made to Chetley,
Thereafter, Linda filed an answer to appeal, contending that the trial court erred in failing to award her attorney’s fees, legal interest, and costs. She later filed a supplemental answer to appeal, contending that the trial court further erred in awarding an incorrect amount for the monthly spousal benefit, which she contends was “clearly a clerical error.”
In response to the supplemental answer to appeal, this court issued a rule to show cause order, wherein it noted, upon examination of the record, that the supplemental answer to appeal appeared to have been filed untimely. Thus, this court ordered the parties to show cause by briefs as to whether the supplemental answer to appeal should be dismissed as untimely. Ballex v. Municipal Police Employees’ Retirement System, 2016-0905 (La. App. 1st Cir. 8/29/16). By subsequent order of this court, the rule to show cause was referred to the panel to which the appeal is assigned. Ballex v. Municipal Police Employees’ Retirement System, 2016-0905 (La. App. 1st Cir. 11/15/16).
LEGAL EFFECT OF CHETLEY’S NOVEMBER 8, 2006 SELECTION OF THE MAXIMUM BENEFIT RETIREMENT PLAN AND LINDA’S ENTITLEMENT TO A RETIREMENT BENEFIT
(Assignments of Error Nos. 1, 2 & 3)
In its first and third assignments of error, MPERS contends that the trial *1082 court erred -in concluding that .Chetley’s November 8, 2006 retirement application, through which he falsely asserted that he was divorced and selected the Maximum Plan retirement option without the consent of hislswife Linda, was without legal effect and, thus, in awarding Linda a monthly spousal retirement benefit.
MPERS is a retirement system established by the Louisiana Legislature for the purpose of providing retirement benefits for municipal policemen in Louisiana. LSA-R.S. 11:2211(A). The evidence of record establishes that MPERS' is also a “qualified” plan under section 401 of the Internal Revenue Code, 26 U.S.C. § 401, entitled “Qualified pension, profit-sharing, and stock bonus plans.” A-trust forming part of an employee benefit plan and satisfying the requirements of 26 U.S.C. § 401, et seq., constitutes a qualified trust that entitles the employer and plan participants to certain tax benefits. See 26 U.S.C. §§ 402(a)s 404, & 601(a); see also Trebotich v. Commissioner of Internal Revenue, 492 F.2d 1018, 1024 n.11 (9th Cir. 1974). One of the requirements of a “qualified” trust' forming part of such a plan under 26 U.S.C.- § 401 is that the trust pay a lifetime survivor benefit to the surviving spouse of a participant who has become vested in a pension plan prior to retirement, unless the plan participant elects to waive the survivor benefit. See 26 U.S.C. §§- 401(a)(1 1) & 417(a)(1). This annuity benefit, which combines a benefit payable for the life of the plan participant with a survivor annuity of not less than 50 percent of plan'participant’s annuity, payable for the life of the spouse, is referred to as á “qualified joint and survivor annuity.” 26 U.S.C.' §§ 401(a)(ll) & 417(b). Because MPERS is an employee benefit plan that is a “qualified” plan under 26 U.S.C. § 401 et seq., it is required to provide such a joint and survivor annuity to the spouses of its members, unless validly waived.
Under the Internal- Revenue Code provisions, a plan participant may elect to waive the qualified joint and survivor annuity. 26 U.S.C. § 417(a)(1)(A)®. However, such an -election shall not take effect unless the | ^participant's spouse has effectively consented to such waiver. See 26 U.S.C. §§ 401(a)(ll) and 417(a)(2). Specifically, 26 U.S.C. § 417(a)(2) provides, as it did at the time Chetley entered into DROP and selected the Maximum Plan retirement option with no survivor benefit for his spouse Linda, as follows: ■
(2) Spouse must consent to election.—Each plan shall provide that an election under paragraph (l)(A)(i) shall not take effect unless—
(A) (i) the spouse of the participant consents in writing to such election, (ii) such election designates a beneficiary (or a form of benefits) which may not be changed without spousal consent (or the consent of the spouse expressly permits designations by the participant without any requirement of further consent by the spouse), and (iii) the spouse’s consent acknowledges the effect of such election and is witnessed by a plan representative or „a notary public, or
(B) it is established to the satisfaction of a plan representative that the consent required under subparagraph (A) may not be obtained because there is no spouse, because the spouse cannot be located, or because of such other circumstances as the Secretary may by regulations prescribe.
Any consent by a spouse (or establishment that the consent of a spouse may not be obtained) under the preceding sentence shall be effective only with respect to such spouse.
(Emphasis added). Thus, pursuant to section 417(a)(2), where a plan participant is *1083 married, the participant's election to waive the qualified joint and survivor annuity is ineffective without the spouse’s written consent, which is witnessed by a plan representative or a notary public and acknowledges the effect of the plan participant’s election. See Edelman v. Smith Barney, Inc., 55 F.Supp.2d 218, 221-223 (S.D. New York 1999), and In re Lefkowfe, 767 F.Supp. 501, 506 (S.D, New York 1991).
In conformity with 26 U.S.C. § 417(a)(2), the MPERS Member Handbook in effect at the time Chetley completed his DROP application and |1flattempted to select the Maximum Plan retirement option without Linda’s written consent provided as follows:
J. CONSENT OF SPOUSE TO SELECTION OF RETIREMENT OPTION
Retiring members must either select an option that provides at least fifty percent (50%) of the benefit payable to the retiree’s spouse or obtain the spouse’s consent to select some other option or beneficiary. Options 2, 2a, 3 and 3a meet this requirement, provided the spouse is the named beneficiary. The retiree may select the Maximum plan or Option 1 or name another individual as beneficiary, only if the spouse agrees with the choice and provides an affidavit to substantiate such agreement.
(Emphasis added).
It is undisputed herein that Linda never executed the required spousal consent allowing Chetley to waive the qualified joint and survivor annuity and choose the Maximum Plan retirement option. Accordingly, his selection of the Maximum Plan retirement option was without legal effect, and Linda is entitled to the qualified joint and survivor annuity in the form of a monthly benefit of 60% of Chetley’s monthly benefit as calculated under Option 3, payable from the time of Chetley’s death and continuing until Linda’s death, which represents the minimum spousal benefit required by the Internal Revenue Code for a “qualified” trust. 26 U.S.C. §§ 401(a)(ll) & 417(b).
Moreover, MPERS’s suggestion that the fact that Chetley’s actions in falsely asserting that he was divorced when selecting the Maximum Plan retirement option without the consent of his wife Linda somehow negates Linda’s entitlement to a monthly benefit upon his death is without merit. Section 417(a)(2) mandates that Chetley’s selection of the Maximum Plan retirement option, which provided for ho survivor benefit for Linda, “not take effect” unless,.the spouse gives the required written consent or “it is ^^established to the satisfaction of a plan representative” that the, required consent may not be obtained because, among other things, “there is no spouse.” 26 U.S.C. § 417(a)(2)(B). In the instant case, despite the fact that MPERS had on file information that Chetley. was married, the ' MPERS director, Katherine Bourque, testified that when she received Chetley’s subsequent DROP application on November 13, 2006, indicating that he was divorced, she simply took Chetley’s word that he was in fact divorced.[5] In accordance with MPERS’s practice at the time, *1084 she did not require that Chetley submit a copy of a judgment of divorce to establish his marital status at the time he applied for DROP.[6] Under the facts herein, we conclude that MPERS’s mere reliance on Chetley’s representation that he was divorced without any supporting documentation does not satisfy the requirements of 26 U.S.C. § 417(a)(2)(B) that the plan representative “establish[] to [her] satisfaction” that spousal consent is not required because there is no spouse.
Finally, -with regard to MPERS’s contention in its second assignment of error that the trial court erred in failing to recognize its statutory immunity pursuant to LSA-R.S. 9:2798.1, we likewise find no merit to this argument. Louisiana Revised Statute 9:2798.1 provides that liability shall not be imposed on public entities or then-officers for “policymaking or discretionary acts” in “the course and scope of their lawful powers and 11gduties” unless, among other exceptions, the acts or omissions constitute “criminal, fraudulent, malicious, intentional, willful, outrageous, reckless, or flagrant misconduct.” LSA-R.S. 9:2798.1(B) & (C)(2). MPERS avers on appeal that because the actions taken by MPERS with regard to Chetley’s retirement were official acts, Linda had to show that MPERS committed gross negligence to overcome the immunity afforded to MPERS by LSA-R.S. 9:2798.1.
However, we note that while LSA-R.S. 9:2798.1 protects a public entity and its officers and employees from liability for negligence claims, see Gleason v. NUCO, Inc., 99-2954 (La.App. 1 Cir. 12/22/00), 774 So.2d 1240, 1242, the award in favor of Linda herein is not based on a damage award for negligence on the part of MPERS or its officers. Rather, it is merely a determination of her eligibility for and entitlement to a survivor benefit based on her ex-husband’s membership in and retirement with MPERS and based on the lack of her written consent to a waiver of that benefit, as required by both the Internal Revenue Code and the MPERS Member Handbook.[7]
For these reasons, we find no error in the trial court’s conclusion that Chetley’s selection of the Maximum Plan retirement option, leaving no spousal benefit for Linda upon his death, was without legal effect given that Linda did not consent in an affidavit to Chetley’s attempt to waive her spousal benefit.
Accordingly, assignments of error numbers one, two, and three have no merit.
11;,LINDA’S ENTITLEMENT TO ONE-HALF OF THE DROP ACCOUNT PROCEEDS
(Assignment of Error No. 4)
In this assignment of error, MPERS contends that the trial court erred in awarding Linda one-half of the value that Chetley’s DROP account had at the time he withdrew his DROP funds from MPERS. We agree.
As set forth above, at the end of his DROP participation on April 7, 2009, Chet- *1085 ley had a balance of $91,551.37 in his DROP account. Thereafter, on June 1, 2009, MPERS transferred the entire balance in Chetley’s DROP account to an IRA account Chetley had established with the Police and Firemen’s Insurance Association, pursuant to a rollover request MPERS had received from Chetley on May 19, 2009. Once this transfer was achieved, all of Chetley’s DROP funds were removed from the MPERS system.
Pursuant to LSA-R.S. 11:2221(H), upon termination of employment at the end of the member’s DROP participation, the DROP participant “shall receive, at his option, a lump sum payment from the account equal to the payments to the account, or a true annuity based upon his account, or he may elect any other method of payment if approved by the board of trustees.” (Emphasis added). Importantly, a DROP participant’s beneficiary has no right to direct the method in which the participant’s DROP funds are received during the life of the participant. See LSA-R.S. 11:2221(H) & (I)(Z). Moreover, we note that pursuant to LSA-C.C. art. 2346, “[e]ach spouse acting alone may manage, control, or dispose of community property unless otherwise provided by law.”
In the instant case, Chetley and Linda were married at the time of his retirement and at the time the entirety of his DROP funds were lawfully and validly transferred out of MPERS at Chetley’s' direction. Thus, at the time 114of his death, there were no DROP funds being held by MPERS on behalf of Chetley. Thus, we must conclude that the trial court erred in ordering MPERS to reimburse Linda one-half of the balance of Chetley’s DROP account funds at the time he withdrew those funds from MPERS. Accordingly, that portion of the judgment must be reversed.
MPERS’S ENTITLEMENT TO A CREDIT FOR OVERPAYMENT OF BENEFITS
(Assignment of Error No. 5)
In its final assignment of error, MPERS contends that if Linda is in fact entitled to a spousal retirement benefit, resulting in the Maximum Plan retirement option being revoked and Option 3 implemented, then the trial court erred in failing to extend a credit to MPERS for over-payments it made to Chetley from the time of his retirement until his death. We find no merit to this argument.
At the outset, we note that MPERS did not assert its right to such a credit in its answer below. A defendant’s entitlement to a credit is an affirmative defense, which must be specifically pleaded in the defendant’s answer. LSA-C.C.P. arts. 1003 & 1005; Hogan v. State Farm Automobile Insurance Company, 607 So.2d 747, 751 (La. App. 1st Cir. 1992). Because the issue of MPERS’s entitlement to a credit for any overpayments it made to Chetley was not raised in its answer, we conclude that, even assuming that such a credit for over-payments to Chetley could be applied to sums owed to Linda, the trial court did not err in failing to grant a credit to MPERS herein.
ANSWER AND SUPPLEMENTAL ANSWER TO APPEAL
I. Timeliness of Supplemental Answer to Appeal
Before addressing the issues raised by Linda in answer to MPERS’s appeal, we first address the show cause order issued by this court on August 29, 2016, as to whether her supplemental answer to appeal should be | ^dismissed as untimely. Louisiana Code of Civil Procedure article 2133 provides that where an appellee de *1086 sires to have the judgment on appeal modified, revised, or reversed in part, the ap-pellee “must file an answer to the appeal, stating the relief demanded, not later than fifteen days after the return day or the lodging of the record whichever is later.” The record reflects that Linda timely filed an answer to MPERS’s appeal, seeking attorney’s fees, interest, and costs. Thereafter, more than fifteen days after the passage of the date on which the record was lodged, Linda filed a supplemental answer to the appeal, seeking amendment of the amount of the monthly retirement benefit awarded in her favor, which later filing prompted this court to issue the show cause order.
In response to this court’s show cause order, Linda acknowledged that the supplemental answer to appeal was filed after the fifteen-day period for answering the appeal had lapsed. However, she notes that in the past, this court, out of fairness to the litigants, has allowed the filing of a supplemental answer to appeal after the delay has expired. Moreover, in its response to this court’s show cause order, MPERS stated that it did not object to the filing of the August 22, 2016 supplemental answer to appeal.
In Eschete v. Gulf South Beverages, 442 So.2d 556, 558-560 (La. App. 1st Cir. 1983), the appellant sought to dismiss the appellee’s supplemental answer to appeal, where the appellee’s answer to appeal was timely, but the subsequently filed supplemental answer to appeal was outside of the fifteen-day period set forth in LSA-C.C.P. art. 2133. In denying the appellant’s motion to dismiss the supplemental answer, this court reasoned as follows:
While it is generally true that where an answer to an appeal is filed more than 15 days after the record is lodged with the appellate court it will be considered as untimely, [^nevertheless, we think fairness requires the consideration of plaintiffs supplemental answer in this case. First, it must be remembered that the appellee filed his original answer timely, thereby placing defendant on notice that plaintiff was not satisfied with at least some portions of the trial court’s judgment. Second, appellee’s supplemental answer does not raise any issue that appellant has not been aware of, or has not prepared for, since the inception of this case. Third, since the supplemental answer was filed in March of 1983, and this case was not placed on the docket until October of 1983, defendant has had ample opportunity to address the issue raised in appellee’s supplemental answer. Thus, we think that where an ap-pellee timely files an answer to an appeal, later supplements that answer more than 15 days after the return date with leave of court, but raises no new issues and affords an appellant ample time within which to . respond to the supplemental answer, then pursuant to the powers vested in the court by La. C.C.P. art. 2164, it is both just and efficient to consider the supplemental answer.
Eschete, 442 So.2d at 559.
In the instant case, as in Eschete, Linda’s original answer to appeal was timely filed, thereby placing MPERS on notice that she was seeking revision or amendment of the trial court’s judgment. Additionally, the issue as to the correct figure to which Linda would be entitled in monthly benefits under Option 3 was an issue addressed at trial, and the supplemental answer to appeal was filed months before this matter was placed on the docket of this court, allowing MPERS ample time to address this issue. Moreover, we note that MPERS has indicated that it does not object to the filing of the supplemental answer to appeal. Considering *1087 these factors, we conclude that MPERS is not prejudiced in any way by the filing of the supplemental answer to appeal, and we further find that fairness dictates that we consider the supplemental answer herein. See LSA-C.C.P. art. 2164 & Eschete, 442 So.2d at 559. Accordingly, we recall the August 29, 2016 show cause order and now address the merits- of Linda’s answer to appeal and supplemental answer to appeal.
117II. Merits of Answer and Supplemental Answer to Appeal
In Linda’s supplemental answer to appeal, she contends that the amount of her monthly retirement benefit awarded in the judgment is incorrect. Linda contends that the amount awarded in the trial court’s judgment should be amended “inasmuch as the uncontradicted testimony of [MPERS’s] director established that the correct amount was $1,558.16 per month rather than $1,373,69 per month....” We agree.
MPERS director Bourque testified at trial that where a member selects the Maximum Plan retirement option, but does not timely submit the required spousal consent, MPERS calculates the retirement benefit under Option 3, the option that provides the minimum spousal benefit required by the Internal Revenue Code and the MPERS Member Handbook. She further testified that based on her calculations, under Option 3, Chetle/s monthly benefit would have been $3,106.31, and the beneficiary amount upon his death would have been $1,553.16 per month. Based on this uncontradicted testimony, we will amend the trial court’s judgment accordingly.
Turning next to Linda’s contention in her answer to appeal that the trial court erred in failing to award her attorney’s fees, we note that under Louisiana law, attorney’s fees are not allowed except where authorized by statute or contract. Dipaola v. Municipal Police Employees’ Retirement System, 2014-0037 (La.App. 1 Cir. 9/25/14), 155 So.3d 49, 52, writ denied, 2014-2575 (La. 2/27/15), 159 So.3d 1071. Linda’ contends that she is entitled to an award of attorney’s feds pursuant to LSA-R.S. 11:264.7. This statute is contained within thé subpart of the provisions governing consolidated public retirement systems that specifically addresses the governing of fiduciary responsibilities and investments of those who exercise, discretionary authority or discretionary control with respect to the [ 1sasset management of public retirement or pension systems, funds, and plans in order to maintain, the fiscal integrity of these plans. LSA-R.S. 11:261; Dipaola, 155 So.3d at 52-53. Pursuant to LSA-R.S. 11:264.7(A) and (C), a member or beneficiary of such a retirement system “may bring a civil action to enforce the provisions of this. Subpart,” and if the member or beneficiary prevails, he or she “shall be awarded reasonable attorney fees and other costs of litigation.” • ,
.In the instant case, Linda alleged in her supplemental and amending petition that Bourque, a fiduciary of MPERS as defined in LSA-R.S.- 11:261 et seq., breached her fiduciary duties to Linda, thus entitling Linda to an award of attorney’s fees pursuant to LSA-R.S. 11:264.7. Moreover, in her appellate brief, Linda’s argument in support of an attorney’s fees award also focuses on Bourque’s alleged breaches of'her fiduciary'duty to Linda. However, we note that the trial court’s judgment dismissed with prejudice Linda’s claims against Bourque, specifically finding that “Kathy Bourque as the Director, of [MPERS] did not breach any fiduciary duty to the plaintiff,” a ruling that Linda *1088 has not challenged on appeal.[8]
Thus, pretermitting whether this action constitutes an action to enforce the provisions of LSA-R.S. 11:261 et seq., see Dipaola, 155 So.3d at 53 (noting that where the plaintiff had alleged that MPERS and its employees had negligently and arbitrarily reduced his retirement benefits, there was “no allegation that MPERS, or any individual associated with MPERS, breached any fiduciary duty related to the investment or management of MPERS’ 11sfunds and/or assets”), or whether Bo-urque is a “fiduciary” within the meaning of LSA-R.S. 11:264, we conclude Linda cannot establish her entitlement to attorney’s fees herein where she has not challenged or assigned error to the trial court’s dismissal of her breach of fiduciary duty claim asserted against Bourque.
Turning to Linda’s contention that the trial court erred in failing to award legal interest on the sums she was awarded, LSA-C.C.P. art. 1921 provides that “[t]he court shall award interest in the judgment as prayed for or as provided by law.” Because Linda specifically prayed for legal interest in her original petition, the trial court erred in failing to award it. See Guidroz v. State, Through Department of Transportation and Development, 94-0253 (La.App. 1 Cir. 12/22/94), 648 So.2d 1361, 1371. Thus, the judgment will be amended accordingly to reflect an award of interest as follows: on all sums due prior to October 24, 2012, the date of judicial demand, from October 24, 2012, until paid; and for all sums due after October 24, 2012, from the date due until paid. See LSA-C.C. art. 2000 (“[w]hen the object of the perform-anee is a sum of money, damages for delay in performance are measured by the interest on that sum from the time it is due, at the rate agreed by the parties or, in the absence of agreement, at the rate of legal interest as fixed by R.S. 9:3500...”).
Finally, with regard to Linda’s contention that the trial court erred in ordering that each party would bear their own court costs, we find no merit to this argument. To the extent that Linda relies upon LSA-R.S. 11:264.7, regarding clams for breach of fiduciary duties in the management and investment of public retirement funds, to support her claim for court costs, we conclude that, for the same reasons that she could not establish her entitlement to attorney’s fees under this statute, she likewise cannot establish Loher entitlement to court costs on that basis. Moreover, pursuant to LSA-O.C.P. art. 1920, the general codal provision regarding the award of costs, “the court may render judgment for costs, or any part thereof, against any party, as it may consider equitable.” While the general rule is that the party cast in judgment should be assessed with court costs, the trial court may assess costs in any equitable manner and against any party in any proportion it deems equitable, even against the party prevailing on the merits. Upon review, an appellate court will not disturb the trial court’s fixing of costs absent an abuse of the sound discretion afforded the trial court. Bourg v. Cajun Cutters, Inc., 2014-0210 (La.App. 1 Cir. 5/7/15), 174 So.3d 56, 73-74, writs denied, 2015-1306, 20151253 (La. 4/4/16), 190 So.3d 1201, 1205. Considering the par *1089 ticular facts of this case, we find no abuse of the trial court’s sound discretion in ordering each party to bear their own costs.
CONCLUSION
For the above and foregoing reasons, the August 29, 2016 Rule to Show Cause Order issued by this court is recalled, and Linda Ballex’s supplemental answer to appeal is maintained. The portion of the trial court’s February 2, 2016 judgment ordering the Municipal Police Employees’ Retirement System to pay plaintiff, Linda Ballex, $1,373.69 per month from October 10, 2011, and continuing for the remainder of her life, is hereby amended to provide that the amount of the monthly award is $1,553.16, and as amended, this portion of the judgment is affirmed. The portion of the judgment awarding plaintiff $45,775.69, representing one-half of the DROP benefits that were received by the decedent, Chetley M. Ballex, is reversed. The judgment is further amended to award plaintiff legal interest on all sums due on or before the date of judicial demand, October 24, 2012, from that 1 ⅞1 date until paid, and for all sums due after October 24, 2012, from the date due until paid. In all other respects, the judgment is affirmed.
Costs of this appeal in the amount of $1,943.50 are assessed equally against Linda Ballex and the Municipal Police Employees’ Retirement System.
RULE TO SHOW CAUSE ORDER RECALLED; JUDGMENT AFFIRMED IN PART, REVERSED IN PART, AMENDED IN PART, AND, AS AMENDED, AFFIRMED IN PART.
McCLENDON, J. concurs and assigns reasons.

. See LSA-R.S. 11:2211 etseq.

. Through DROP, an eligible member, in lieu of terminating employment and receiving a retirement benefit, may elect to continue to work for a period not to exceed three years and have the monthly retirement benefit that would have otherwise been payable to him paid into the DROP account. Upon the termination of employment, the deferred benefits paid into the fund are payable to the member in one of the approved methods of payment, and the monthly benefits that were being paid into the fund during DROP participation begin being paid to the retired member. See LSA-R.S. 11:2221.;

.Consistent with the requirements of 26 Ü.S.C. § 417(a)(2)(A),' the MPERS Member Handbook in effect at the time also provided as follows:
Retiring members must either select an option that provides at least fifty percent (50%) of the benefit payable to the retiree's spouse or obtain the spouse's consent to select some other option or beneficiary. Options 2, 2a, 3 and 3a meet this requirement, provided the spouse is the named beneficiary. The retiree may select the Maximum plan or Option 1 or name another individual as beneficiary, only if the spouse agrees with the choice and provides an affidavit to substantiate such agreement.

. The day after, by judgment dated September 15, 2011, Chetley and Linda Ballex were divorced. According to Linda, she had filed the divorce proceeding in May 2010, but it had been put "somewhat” on hold because Chet-ley had become ill.

. The information MPERS had on file included a May 11, 2005 Personal History Information Update form from Chetley designating his wife Linda Ballex as his beneficiary and a prior .DROP application Chetley had submitted slightly more than a year before he entered DROP, on which he indicated that he was married and yet still attempted to select the Maximum Plan, retirement option with no accompanying spousal consent (an application that he withdrew upon being informed that Linda’s written consent was needed for the selection made).

. Indeed, Bourque acknowledged that even a judgment of divorce would be insufficient to determine an ex-spouse's entitlement to his or her share of retirement benefits and that a judgment of partition dividing the retirement benefits would be necessary for such a determination.

. Moreover, to the extent that Linda’s claim against Bourque for breach of fiduciary duty could be classified as a negligence claim, see generally Beckstrom v. Parnell, 97-1200 (La. App. 1 Cir. 11/6/98), 730 So.2d 942, 947-948 (on rehearing), we note that the trial court’s judgment dismissed Linda’s claim against Bo-urque and that portion of the judgment has not been challenged on appeal.

. Although, as previously, noted in the Facts and Procedural History, the trial court stated in its written reasons for judgment that it was unnecessary to address Linda’s claims of breach of fiduciary duty, the judgment itself dismisses those claims on a finding that Bo-urque did not breach any fiduciary duty to Linda. Where there is a conflict between the judgment and the reasons for judgment, the judgment prevails. See Watts v. Aetna Casualty and Surety Company, 574 So.2d 364, n.1 366 (La. App 1st Cir.), writ denied, 568 So.2d 1089 (La. 1990).